Thomson, Executor, v. Mylne.

Murray Menzies Thomson, Executor of the last will of George B. Milligan, deceased, *v.* William Craig Mylne.

By an act *sous seing privé*, signed by both parties, registered, on proof by a witness of the signatures of the parties, in a notary's office, and subsequently recorded in the office of the parish judge of the parish in which the land was situated, D. & Co. agreed to sell to the plaintiff one third of a plantation, with the slaves, etc. thereon, for a certain sum, payable in seven yearly instalments, the latter binding himself, should any amount remain unpaid at the end of the seven years, to give a special mortgage on the property for such balance, with interest from that time. The contract stipulated, that the plaintiff should reside on the plantation, and manage it for a fixed salary; that the supplies should be furnished by D. & Co., and the crops sold by them, and that the proceeds of the sales, after deducting expenses, should be considered the annual product of the plantation, one third of which should be placed to the credit of the plaintiff; that the contract should continue for seven years, renewable if agreeable to all parties, but if a dissolution should take place, the value of the property to be fixed for settlement by mutual appraisement, or by public sale; that plaintiff should pay one third of what may be expended on certain proposed improvements, with interest, from the date of the advance by D. & Co. of the necessary sum, until plaintiff's share be paid; and that "the agreement should be regularly completed before a notary as soon as possible." *Held*, that the act was not merely a promise to sell, but an absolute sale, which vested the ownership of one third of the plantation, slaves, etc., in the plaintiff, from its date, the vendors becoming his creditors for the price; that the term of seven years was stipulated only in reference to the duration of the partnership; and that the declaration that the agreement should be completed as soon as possible before a notary, was not an essential condition of the contract, but a mere provision for securing regular evidence of the convention.

A sale is complete between the parties as soon as there exists an agreement for the object and the price, though the object be not yet delivered, nor the price paid. C. C. 2414, 2431. And such a sale has effect against third persons from the date of its registry in the office of a notary, and the actual delivery of the thing sold. C. C. 2242, 2417.

A promise to sell amounts to a sale where there exists a reciprocal consent of both parties, as to the thing and the price. C. C. 2437.

Where a partner in a particular partnership, entitled to an undivided third of certain immovable property, permits his copartner to mortgage the whole for the payment of an individual debt of the latter, he may be estopped from disputing the mortgage; but such permission will not amount to a renunciation of his title, nor to an acknowledgment of the mortgagor's title to the whole of the property.

A District Court has jurisdiction of an action by the executor of a deceased partner against the survivor, for a settlement of the partnership accounts.

A balance due by the succession of one of the members of a particular partnership to his copartner, for the price of his share in a plantation cultivated by them in partnership, is not a partnership debt to be satisfied out of the partnership property. The survivor is not a creditor of the partnership, but of his deceased partner.

Thomson, Executor, v. Mylne.

The jurisdiction of District Courts extends to the liquidation of claims against succes-
sions when pleaded in compensation or reconvention, so far as the conflicting claims
extinguish each other; but for any balance ascertained to be due to the defendant
he must resort to the court in which the succession was opened, that his rank may
be ascertained contradictorily with the other creditors, and his claim placed in its
proper place on the *tableau* of distribution.

APPEAL from the District Court of the First District, *Buchan-
an, J.*

This case grew out of the following agreement, and presented
the question whether the instrument itself amounted to an ab-
solute sale, vesting a title to one third of the property in Milli-
gan, from its date. A full statement of the pleadings and evi-
dence will be found in the opinion of the court, *infra.*

"Agreement betwixt Messrs. Dennistoun & Co. on the one
part, and G. B. Milligan on the other.

1st. Dennistoun & Co. agree to sell to G. B. Milligan one
third of the sugar plantation they own, situated near the English
Turn on the other side of the river, with all the slaves, build-
ings, utensils, &c., thereon, or appertaining thereto, for fifty-two
thousand dollars, payable in one, two, three, four, five, six and
seven years, in equal instalments, without any interest until the
end of the contract; and on whatever sum may be then unpaid,
G. B. Milligan to pay six per cent interest per annum, with
special mortgage of the property until the whole is paid.

2d. It is understood that ten slaves and six manumitted ne-
groes, owned by G. B. Milligan, are to remain on the estate
to assist in its cultivation, and be fed and clothed as the other
negroes on the plantation, at the general expense.

3d. It is understood that G. B. Milligan will reside upon
the plantation and devote his attention wholly and exclusively
to its cultivation and improvement; that he shall receive from
the concern an annual salary of one thousand dollars, and have
the privilege of what the plantation may yield, for his own use;
but his expenses otherwise to be borne by himself.

4th. The supplies requisite for the plantation to be furnished
by Dennistoun & Co., and a commission thereon of $2\frac{1}{2}$ per cent,
as well as on all sums they may lay out, to be charged; the crop
of sugar to be sold by them charging a commission of $2\frac{1}{2}$ per
cent, as well as on the proceeds of any wood, stock, or other pro-

duce that may be sold ; an annual statement to be made out ; and the proceeds of the sales, after deducting the current expenses, to be considered the annual product of the plantation, one third of which to be placed to the credit of G. B. Milligan, and the remaining two thirds to the credit of Dennistoun & Co.

5th. That this contract shall exist for seven years ; at the end of which period, if agreeable to all parties, be renewed ; but if a dissolution should take place, the value of the property to be fixed for settlement by mutual appraisement, or by public sale.

6th. In case the proposed sugar house and other buildings are erected, and additional negroes purchased, G. B. Milligan to pay one third of whatever sums may be laid out, bearing interest at six per cent per annum from the date of the money being advanced by Dennistoun & Co., until his share is paid.

7th. This agreement will be regularly completed by a notary public as soon as possible. Signed in duplicate. New Orleans, this sixteenth day of March, 1828.

(Signed)                          Dennistoun & Co.
                                  G. B. Milligan."

*Eustis*, for the plaintiff.

*D. Seghers*, for the intervenors. The agreement was not a mere promise to sell ; it was an actual sale to Milligan of one third of the plantation. Civil Code, art. 2414. The sale was perfect as soon as the agreement was signed. Ib. 2431. There was no occasion to complete it before a notary. Troplong, Vente, vol. 1, pp, 191, 193, no. 119. It had full effect against third persons from its registry in the notary's office, and in the office of the parish judge. Civil Code, arts. 2417, 2242. Acts of 1810, ch. 25, p. 60, s. 7. Delivery is proved by the agreement itself. Milligan, who had resided on the plantation before the sale, continued to do so after. Previously to the sale he possessed for his employers ; afterwards he possessed two thirds for Dennistoun & Co., and the remaining third for himself, *animo domini*.

The promise to sell amounts to a sale in this case. Civil Code, arts. 2414, 2415, 2437. Troplong, Contrat de Vente, vol. 1, pp. 193, 194. Troplong, p. 160, quotes Portalis who says : " *La promesse de vente vaut vente lorsqu'il y aura consentement réciproque des deux parties sur la chose et sur le prix. On trouve effective-*

*ment, en pareil cas, tout ce qui est de la substance du contrat de vente.*
Next he quotes Cochin, who says: " Il est de principe qu'on n'est
pas moins lié par une acte que l'on rédige et que l'on signe soi-
même, que par ceux qui se font en présence des notaires. Si,
par l'acte même, on s'oblige à en passer un autre pardevant
notaires, l'acte pour cela n'est pas un simple projet, c'est seule-
ment une forme plus authentique que l'on promet d'y ajouter,
mais dont on peut se passer.

Il a été mille fois jugé qu'une promesse de passer contrat de
vente était obligatoire, quoiqu'il n'y eut aucun contrat passé
en conséquence, et qu'il suffisait pour cela que la promesse con-
tînt les conditions essentielles de la vente, *substantialia con-
tractûs.*

Cochin ajoute : 'Ce n'est pas une simple promesse de passer
contrat, c'est un acte parfait par lui-même, qui contient une
obligation présente, absolue, sans retour, et à laquelle on a seule-
ment ajouté la promesse de le cimenter par un acte devant
notaires, si la Dame de Mézières (l'acquéreur) le réclamait."

Merlin, after stating the doctrines which prevailed on this sub-
ject in France previous to the Code Napoleon, and the questions
which arose thereunder, adds: " Le Code Civil a rendu cette
question sans objet en adoptant l'opinion des docteurs qui assim-
ilaient la promesse de vendre à une vente effective. La pro-
messe de vendre vaut vente, lorsqu'il y a consentement réciproque
des deux parties sur la chose et le prix." C. N. art. 1589, (La.
Code, art. 3437.) Merlin, Répertoire, *verbo* Vente, § 7, tome 36,
p. 84. Edition de Bruxelles.

The defendant and his partners have recognised the owner-
ship of the one third by Milligan, by allowing him in their
accounts one third of the revenue of the plantation, and by
stipulating that they should have their commissions on the sale
of the crops, &c.; which would have been a useless stipulation,
had the plantation, and consequently the crop, been exclusively
their own.

Any claim of the defendant, or his vendors, against the suc-
cession of Milligan, must be settled before the court in which
his succession was opened, contradictorily with the other cred-
itors. Milligan's alleged tacit assent to the mortgages given by

Mylne to the Union Bank, might have estopped him from denying the title of the Union Bank, when opposed by the Bank ; but it could not conclude him when opposed by Mylne.

*Briggs* and *Grymes*, for the appellant. The letter written by Milligan to A. Dennistoun, at the time of Hill's death, (at p. 359 *post*) shows the nature of the arrangement, contemplated by the parties to the agreement, subsequently entered into. If this agreement were an actual sale, the provision of the fifth clause were useless, for Milligan, being a proprietor, as well as Dennistoun, was entitled to enforce a judicial partition. If it was intended that Milligan should become a proprietor from the date of the agreement, why did his vendor provide for a mortgage to be taken at the end of the seven years? The instrument was a mere agreement to form a partnership, the whole capital of which was furnished by defendant's vendor. A partner may be a creditor of the partnership. Civil Code, art. 2835 ; and by art. 2794, the partnership assets are liable to partnership creditors in preference to others. *Purdy* v. *Hood*, 5 Martin, N. S. 130. See Gow on Partnership, and Story on the same subject, p. 135. The cases of *Nathan* v. *Gardere* (11 La. 264), and *Bernard, Syndic* v. *Dufour* (17 La. 598), are not inconsistent with the position here contended for. In construing the expression, *promesse de vente vaut vente*, no commentator, nor any decision, has ever gone the length of decreeing title, without a performance of the conditions subscribed to. Had Milligan died within a few months after the execution of the agreement of the 16th of March, 1828, and, unknown to Dennistoun & Co., largely indebted, would the court have decreed the property to belong to his creditors, when not a dollar had been advanced by the deceased? In this case, as in that of *Millaudon* v. *Sylvestre*, 8 La. 262, the parties contemplated the formation of a partnership. Milligan was entitled, should he subsequently elect so to do, to become interested in the capital on certain conditions ; and the words of conveyance, or of promise to convey, must be controlled by the spirit and evident meaning of the instrument.

Simon, J. The object of this action, which is instituted by the testamentary executor of the late George B. Milligan, is threefold : He seeks, first, to obtain the partition, in kind or otherwise,

of a sugar plantation, slaves, &c. which, he alleges, belong for
one third to the succession of the deceased, the other two
thirds belonging to the defendant.    2d.  To compel said defend-
ant to account for the crops of sugar and molasses made on the
said plantation since the decease of the testator, and also for the
nett proceeds of the crop on hand at the time of said decease,
received by defendant, and never accounted for.    3d.  To obtain
a settlement and liquidation of the partnership concerns, and of
all the transactions growing out of the same, and a judgment
against the defendant for the portion thereof due to the succes-
sion, &c.

The defendant, after pleading the general issue, admitted the
existence of the agreement alluded to, and set up in the plain-
tiff's petition as the basis and origin of his title, as executor, to
the one third by him claimed, bearing date the 16th of March,
1828, but denied that the deceased derived any right under, or
by virtue of the same, except that of calling for its completion
by an act of sale, on the terms, and on the fulfilment of the con-
ditions therein contained.   He further averred that those con-
ditions have never been complied with by the testator; that the
latter acquiesced in the sale of the premises to the respondent;
and that it was well understood that his said rights should be
perfected on the fulfillment of his part of the said agreement.
That said deceased is indebted to him, defendant, as vendee of
Alexander Dennistoun, assignee of Dennistoun & Co., on this ac-
count, in the sum of $37,650 29, with interest; that he never
disputed the testator's right to call for title to his portion of the
plantation, &c, on the payment of the balance due on the
price, but, on the contrary, is ready, on such payment, to make
the necessary conveyance.   He, therefore, prays for judgment
against the succession for the balance due; for a partition of the
property, by a sale thereof, &c.; and for satisfaction of his claim
out of the proceeds of such sales, &c.

The widow and heirs of David Urquhart, deceased, stating
themselves to be creditors to a large amount of Milligan's suc-
cession, intervened in the action for the protection of their rights,
alleging that the plaintiff, who sues as executor, has, in his own
personal name, an adverse interest in the issue of the cause, he

being a partner of the defendant. They assert: 1st. That the agreement of the 16th of March, 1828, was a perfect and complete sale, binding on the vendors and on the defendant, who acquired subsequently, having been duly recorded in the office of the judge of the parish of Plaquemines, on the 24th of June, 1830. 2d. That the deceased has been in the open and undisturbed possession, as owner, of his undivided third of the property, ever since the date of the contract; that he always complied with the conditions of the agreement, resided on the place, and devoted his attention to its cultivation and improvement; and that the sixteen hands, referred to in the second article of the contract, were constantly kept on the plantation, and still remain there, to assist in its cultivation, &c. 3d. and 4th. That the matters in controversy relative to any claim set up by the defendant, or his vendor, against the estate of the deceased, as also to the settlement of the balance alleged to be due by the deceased on the price of the sale, are within the exclusive jurisdiction of the Court of Probates of the parish of Plaquemines, which court alone has the right to settle and liquidate such claims, to enquire into their validity, and to order their classification on the *tableau* of distribution of the assets of the estate according to their rank. 5th. That the defendant, for his own benefit, has incumbered the property with three several mortgages in favor of the Union Bank of Louisiana, amounting together to $81,420, with interest; and is bound to clear, at his own expense, the succession's third part of the said property from the incumbrances by which it may be affected. The intervenors further say, that they join in the averments of the plaintiff's petition, and pray that a partition of the whole property may be made by a sale thereof, &c.; that by the same judgment the defendant be ordered to account to the succession for its interest in the crops; and that the defendant's claims set up against said succession be dismissed for want of jurisdiction, reserving to the defendant the right of having his said claims settled and liquidated by the Court of Probates, contradictorily with the other creditors of the deceased, &c.

This intervention was answered by the defendant, pretty much on the same grounds as those set forth in his original answer, but further alleging that the agreement referred to was intend-

ed for the contracting of a partnership between the parties thereto; that said partnership was dissolved by the death of the deceased; that the mortgages with which the estate is incumbered, were given with the knowledge and consent of Milligan; and that, by the terms of the agreement, the deceased had a right, at the expiration of seven years, to call for specific performance on securing, by mortgage of the partnership premises, any amount which might be still due, or to dissolve the partnership itself. He admits his liability to account for the profits up to the period of the testator's death, but denies his being bound for profits subsequently accrued; and, finally, avers that he is still willing to make title to the succession, on being paid the amount which, at the time the partnership was dissolved, was to be contributed by the deceased.

Under these pleadings, the case was tried contradictorily with the intervenors, and the judge *a quo* being of opinion that one third of the premises in partnership belonged to Milligan's succession, but that the defendant must be referred to the Probate Court of Plaquemines for a settlement of his claims against said succession, declaring, however, in the mean time, that they constitute no lien upon the property, ordered a division thereof to be made between the parties, in proportion to their respective interests, the mode of partition to be subject of an ulterior decree; and from this judgment the defendant has appealed.

The intervenors have prayed in their answer to this appeal, that the judgment appealed from may be so amended as to allow to the succession of the deceased, its proportion of the crop existing at the time of the death of the testator, as per inventory made at the time of its opening; as also its proportion of all the subsequent crops raised on the plantation since the decease of Milligan until the present time.

The facts exhibited by the record, are mainly these: In a letter addressed by the deceased to Alexander Dennistoun, bearing date 27th December, 1826, after the death of one Hill, the former partner of the firm of Dennistoun, Hill & Co., the deceased communicates his ideas upon the nature and extent of an arrangement which had been contemplated by the parties, but which had never been executed; and he expresses his readiness

to acquiesce in whatever views the change of circumstances resulting from Hill's death may have induced in the mind of Dennistoun, He says he was to be interested one third in the purchase of the plantation at what it cost, allowing five per cent interest, &c., and expresses his views upon the interest he was to have in acquiring a proportion of the property, &c. See letter, p. 359 *post*.

Nothing was done, however, on these propositions until the 16th of March, 1828, when an act under private signature was executed by Dennistoun & Co. on the one part, and G. B. Milligan on the other, in which it was stipulated: 1st. *That Dennistoun & Co. agree to sell to Milligan, one third of the sugar plantation they own &c, with all the slaves, &c. for fifty two thousand dollars, payable in one, two, three, four, five, six and seven years, in equal instalments, without any interest until the end of the contract; and on whatever sum may be then unpaid, Milligan to pay six per cent interest per annum, with special mortgage on the property, until the whole is paid.* 2d. Ten slaves and six manumitted negroes, owned by Milligan, *to remain on the estate to assist, &c.* 3d. Milligan to reside on the place, and to manage it for a salary of $1,000 a year. 4th. The supplies to be furnished by Dennistoun & Co. &c; the crops of sugar to be sold by them, and *the proceeds of the sales*, after deducting the expenses, *to be considered the annual product of the plantation, one third of which to be placed to the credit of Milligan, &c.* 5th *The contract to exist for seven years*, at the end of which period, if agreeable to all parties, to be renewed; but if a dissolution should take place, *the value of the property to be fixed for settlement, by mutual appraisement, or by public sale.* 6th. *Milligan to pay one third of whatever sums may be laid out, in case the proposed sugar house and other buildings are erected and additional negroes purchased, said third to bear interest* at six per cent per annum, from the date of the money being advanced by Dennistoun & Co., *until his share is paid.* And 7th. *This agreement will be regularly completed before a notary public as soon as possible.* This act was regularly registered in a notary public's office in New Orleans, on the 30th of October, 1828, under the declaration on oath of a witness proving the signatures of the parties; and was also recorded in the office of the judge of the parish of Plaquemines, on the 24th of June, 1830.

The partnership went on according to the contract, and continued even after the expiration of the seven years; but, during its existence or operation, the defendant, and M. M. Thomson, being the attorneys in fact of their partners, passed and executed a notorial act, on the 24th of May, 1836, in which they gave to each other a mutual power of attorney and a mutual substitution to the powers of their constituents, by virtue of which the defendant, on the 30th of August, 1836, sold to himself, by authentic act, the plantation, slaves, &c., for the sum of $120,000.

In February and April, 1837, and in January, 1839, the defendant executed three acts of mortgage on the whole premises, in favor of the Union Bank of Louisiana, to secure large amounts loaned to him by the bank, the last of which mortgages was accepted by Milligan, as president of said bank, and who was an officer of the Union Bank, either as president or director, through the whole period embraced by the three mortgages.

Milligan died in March, 1841, and an inventory of his estate having been made in April following, his third interest in the premises was put thereon as a part of his succession, as also his proportion of the preceding crop of sugar and molasses. The same had also been put on the inventory made after the death of his wife, in 1832.

It is further admitted in the record, that Milligan resided on the premises since the 16th of March, 1828, till the time of his death. That during this period, he superintended the cultivation and improvement of the plantation. That the sixteen hands mentioned in the second article of the agreement, or the survivors, have been constantly kept there since its date, and still continue there, for assisting in grinding the crop. That the deceased resided on the said plantation long anterior to March, 1828, acting as manager for the defendant's vendors. That Milligan's succession is insolvent. That both parties claim under the same title, and that the claim of the contracting party with Milligan is not contested, nor that of the defendant to the remaining two thirds; and that the defendant received the crop mentioned in the inventory, and those made on the plantation since.

The record contains also two accounts current, produced in

evidence by the defendant, the first of which, beginning 16th March, 1829, and ending 16th of March, 1835, shows that, during that period, Milligan *was credited with his third of the proceeds* of the crops, in deduction of the *seven instalments* by him due for the price of his portion of the property, leaving a balance then against him of $37,506 58 ; and the second, showing also the credits allowed to him *for his third of the proceeds* of the crops from the year 1835, up to the time of his death, in deduction of said price ; which proceeds, after 1840, ceased to be placed to his credit as heretofore, but were replaced by sums allowed for the yearly wages of his negroes till the 30th of June, 1844, leaving a balance due by the succession on the said day, of $35,000.

Under this state of facts, our first enquiry necessarily is into the title set up by the testamentary executor of the deceased to the one third part of the property which he seeks to recover for the benefit of the succession, and to divide contradictorily with the defendant, who pretends that the agreement above recited is not a complete sale, and that Milligan never acquired under it any other right but that of calling for its completion, on his complying with the terms and conditions therein stipulated.

It seems to us that it cannot be doubted that, when Dennistoun & Co. executed the agreement under consideration, they intended to contract a partnership with the deceased for the term of seven years, and that, for that purpose, it was deemed important and necessary that Milligan should become the owner of a portion of the property.   Indeed, from the very letter of December, 1826, relied on by the defendant, it is manifest that, at that time, though intimating that he would agree to any arrangement which Alexander Dennistoun should think proper to adopt, Milligan's main object was clearly to become the owner of a part of the plantation, and to be interested one third in the purchase ; and that said letter was written with a view of proposing to the firm to execute the same arrangement that had been originally contemplated · between him and the deceased partner.*   The agreement of 1828 was executed, after nearly two

* The material parts of Milligan's letter are subjoined :
In adverting to the death of Mr. Hill, he says : " His communications, I take it for

years reflection upon the subject. In the mean time the deceased acted as manager for the defendant's vendors, and his interest was then fixed at one third in the property, which he was subsequently to manage and superintend for his own benefit and that of his partners. We have already seen that, by the terms of the agreement, Dennistoun & Co. *agree to sell to him for a fixed price*, payable in equal instalments, at seven years' credit, one third of the property which was to compose the stock

granted, have fully apprised you of the nature of my *engagement*, and will very much lessen the delicacy of the situation in which I am aware of being now placed. My object, therefore, in addressing you, at present, is not only to repeat with the utmost frankness what that understanding was, but to enable you also to form an opinion as to the present situation, and probable revenue that may be reasonably expected hereafter from this property. With regard to the original purchase nothing can be suggested, I am sure, that is not already known to you. It was made immediately after the two fine crops of 1819 and 1820—the most productive yet known in Louisiana, and which, by coming in succession and united with the high prices of sugar at that period, had the effect of pushing property of this description far beyond its value; added to which, the moment was additionally inauspicious, as the proprietors of fine estates were then too well satisfied with the cultivation to think of abandoning it, and all others that changed owners were at most extravagant rates, and, *where revenue was necessary from the purchase* to complete the payments, have long since ended in ruin.

"I arrived here a few months only after Mr. Hill had taken possession of the plantation, but long enough for him to have discovered the trouble and inconvenience of directing such property at a distance—indeed, without residing on on it, and the impossibility of finding an overseer who could supersede the necessity of his devoting to it a large portion of his time and attention. I was here with a few negroes, with a view of purchasing land and attending to its cultivation. The peculiar position in which were respectively placed made *an arrangement* desirable to both, and there was no difficulty in our coming at once to an understanding, which we believed was founded upon reciprocal benefit and could not fail to prove advantageous to all parties. I was to be *interested* one-third in the purchase, at what it cost, allowing interest at five per cent for the first year on account of the smallness of the crop—which was then from the unusual severity of the winter, but without our knowing it, nearly destroyed—and afterwards at seven, till the whole amount was paid; placing my negroes on the property at a valuation to be agreed upon, with the exception of six I reserved, but who were also to be put into the crop, and for whose labor $500 per annum was to be allowed—and devoting myself exclusively to the direction of its management, for which, in lieu of expenses, I was allowed by the *concern* an annual salary of $1,000, *the agreement* to continue five years. I went immediately to work, and certainly under the impression that crops could at once be made; and had the place answered my expectations, I am very certain, notwithstanding the unfavorable seasons that followed, the result would have been widely different. At that time Mr. Hill and

in partnership; that his third interest in the ownership of said property is recognized throughout the act; that he was to add to his portion a certain number of slaves and hands, to contribute for one third to the expenses incurred thereafter by the erection of buildings and purchasing of additional negroes, and to be credited with one third of the nett proceeds of the crops. It is true, the seventh clause stipulates that the agreement is to be *regularly completed before a notary public;* but this was not made

---

myself were wholly unaware how much was required, both in labor and money, to put the plantation into proper operation; it had been established for the cultivation of sugar only the year before, and although everything was new everything was unfinshed and incomplete," &c. After going into details of difficulties, he says: " It was of course soon evident to me, after becoming acquainted with the extent and resources of the plantation, *that although in the end* it might afford a good interest for the capital invested, yet, as it was impossible to extend it on the scale we had in contemplation, *it could offer no inducement as a speculation* to a person situated as I was, *relying almost entirely upon personal exertions to make property productive,* and expecting a result which, under the existing arrangement, I plainly foresaw in no event could be realised. Being perfectly persuaded that the motive which had dictated the offer to me had nothing in view but what was founded on mutual adventage, I had no hesitation in communicating my impressions to Mr. Hill, *who was too just not to admit their force;* but he was unwilling that any change should take place till all the improvements were completed and the estate further tested, hoping that more was to be placed to unfavorable seasons, than to want of resources and extent. He however proposed recommending its being disposed of, and, if approved of on your side, a more desirable purchase made. In the meantime he assured me, *I might feel no apprehensions with respect to the interest I had agreed to take,* which was an affair of entire indifference, *the arrangement* having no other object than to secure my personal attention to its management; that if the property was not sold, *I should always be at liberty to take the interest already offered me at a fair valuation,* or, if more desirable, a compensation should be made for the labor of my negroes, as well as for my personal services. With this understanding I was satisfied; the original *agreement was therefore never executed,* no valuation of the negroes took place, and things have since remained on that footing."

After stating his disappointments in the purchase of additional land, he goes on: " This, therefore, was the moment we had looked forward to as offering a good opportunity to realize our intentions; and I have no doubt a speculation could have been made in the course of this spring, by which not only all losses would have been retrieved but a bright and almost certain reward offered for future exertions. Such hopes and calculations on my part are of course entirely defeated by the untimely death of Mr. Hill. I can no longer indulge the expectation, that without him you could think of embarking further in a business from which hitherto you have had so little reason to be satisfied, and which alone would have been authorised upon the

Thomson, Executor, v. Mylne.

a condition of the contract, necessary to make it perfect in its essential requisites; it was for the purpose of making regular the evidence of the convention which the parties conceived would be more regular, if it was put in the shape of a notarial act; and this was to be done *as soon as possible*, that is to say, whenever the parties should be ready to go before a notary public. This might have been done the next day, for it was not necessary to wait until the expiration of the seven years, for the completion of the contract; the sale was absolute and definitive, and the seven years were only stipulated as being the period of the duration of the partnership, at the end of which, if dissolved, the value of the property was to be fixed *for settlement* (and necessarily for partition), by mutual appraisement or by public sale; and Milligan was to furnish a special mortgage on his share of the property (then ascertained), to secure the payment of the balance then remaining due on the price, with interest, until the whole should be paid. Is seems to us, therefore, that the sale was complete, and that the ownership of one third of the premises became vested in Milligan from the date of the agreement; the vendors being simply his creditors for the

sanction of his judgment and the importance of his presence. As long as there was a prospect of extending our planting interest and of making our operations profitable to you, and an object to me, *I have remained satisfied and contented in my employment* The connection was one so highly respectable as to afford both pride and gratification, and the personal intercourse that grew out of it was not only attended with pleasure but had long been cemented by the most intimate and disinterested friendship. Had fate not ordained the melancholy event which I shall long deplore, you would have been spared the pain, and I the embarrassment, of this communication. But as it is impossible for me to know what may now be your intentions with regard to this property, I have only to express my hope that, in any *arrangements* you may think proper to make, you will be satisfied so far as I am concerned, with the understanding I have endeavored to explain."

After details of the then state of the plantation, he concludes:

" I shall feel extremely anxious until I am acquainted with your intentions, *and until I have made some permanent arrangements for the future.* I must request as early a reply to this letter as your convenience will permit. I am aware the subject is one with which you cannot be familiar, and I am therefore far from asking or expecting of you any positive decision my sole motive is to call your attention to the subject, as I can have no hope of seeing you here, that such instructions may be given as you may consider just and proper. In the meantime you may rest perfectly assured *that your interest under my charge will receive the most unremitted attention.*"

Thomson, Executor, v. Mylne.

amount of the price, but being also divested of their title to the third by them transferred and sold to their new co-partner.

Now, art. 2414 of the Civil Code requires that *three circumstances should concur to the perfection of the contract of sale, to wit, the thing sold, the price, and the consent.* By art. 2431, " *the sale is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object and for the price thereof, although the object has not yet been delivered, nor the payment made.*" And with regard to third persons, such sale, under arts. 2417 and 2242, has *its full effect against them* from the day of its being registered in the office of a notary and the actual delivery of the thing sold. Here, the parties had agreed upon the thing sold, and on the price to be paid by the purchaser; they had consented to the purchaser's considering the property sold as his from the date of the act, and to his applying to the payment of the price the proceeds of its annual product; the act was duly recorded as required by law, and the tradition or delivery of the thing sold had clearly taken place, by the stipulation that the vendee was to reside on the plantation and devote his attention wholly and exclusively to its cultivation and improvement. He was, therefore, possessing the property for two thirds for his co-partners, and for one third for himself, and continued to possess it in the same manner until the time of his death. The agreement was not a simple promise to sell, but was *a perfect sale;* in which, again, the vendors, *agreeing to sell* the one third of the property, the purchaser agreed on his part *to pay the sum of* $52,000 *as the price thereof.* But could it be considered only as a " *promesse de vente,*" art. 2437 of our Code, informs us that *it amounts to a sale when there exists a reciprocal consent of both parties, as to the thing and the price;* and, therefore, it must have the same effect. See Troplong, vol. 1, pp. 193, 194, no. 130, in which this doctrine is fully reviewed; and Merlin, Répert. *verbo* Vente, § 7. There is a vast distinction to be made between this case and that of *Millaudon* v. *Silvestre,* 8 La. 262, relied on by the defendant's counsel, and to the record of which we have been referred. There, the object of the action was to dissolve the partnership, to liquidate the partnership affairs, and to recover

whatever sums of money might appear to be due to the plaintiff on such liquidation and settlement; *the sale of one half of the partnership property from Millaudon to Silvestre was maintained,* with the vendor's privilege; the sale subsequently made to a third person of the same property, was declared *collusive and fraudulent;* and the plaintiff was allowed to recover the sum due him, out of the proceeds of the sale *in block* of the whole partnership property, without any regard to the collusive sale made in consequence of the omission to record the act of partnership under which the property was claimed. Here, there is no fraud alleged against any of the parties; the intervenors only seek to maintain the sale for the benefit of the creditors of the deceased; the contract was a *bona fide* one, and it must be governed by the ordinary rules.

In corroboration of the impression which the agreement under consideration has made on the minds of this court, let us enquire a little further into the subsequent acts of the parties. What do we find? From 1828, the partnership premises were placed under the control and administration of the deceased; and the partnership continued to be in operation, not until the expiration of the seven years, but until the death of Milligan, who, during the whole of this period, superintended the cultivation and improvement of the plantation under the contract; his slaves and other hands were kept there all the time; and, his vendors, and subsequently the defendant, having charge, under said contract, of the sale of the crops, one-third of the nett proceeds thereof, continued, even after the expiration of the time, to be placed to his credit, so as to be imputed to the payment of the purchase money. This course was pursued until 1840. In March, 1841, the partnership was dissolved by the death of Milligan, and then the credits ceased, although the defendant continued to raise crops on the partnership plantation, with the same slaves and hands, and acted in the administration and management thereof as the *negotiorum gestor* of the representatives of the deceased. If the sale was not complete, why was one-third of the crops yearly accounted for to the deceased? Why was he charged in the accounts, not only with the instalments of the price, but also with his third of the balance of the

money advanced for improvements? The defendant became, in 1836, the purchaser of the property, but he could not acquire any greater interest or right than his vendors had, to wit, two-thirds of the premises; and he only paid $120,000, which is really a value adequate to the extent of said interest. Every thing shows that the title of the deceased to the one undivided third of the property, far from having ever been contested, was always recognized and respected by his co-partners, and even by the defendant, until the institution of this suit.

With regard to the fact that the whole property was mortgaged by the defendant to the Union Bank, to the knowledge and with the consent of the deceased, we cannot see how this could in any manner affect his title to the third portion of the premises claimed in this action. The mortgagor was his partner; he was largely indebted to the Union Bank; the share of the deceased was undivided; and it is not extraordinary that he should have consented to mortgage his own property to secure a debt which he did not owe, but which had been contracted by a person in whose welfare and prosperity he was greatly interested. It is true, the doctrine has been often recognized, that, if a man, having a title to an estate, which is offered for sale, and knowing his title, stands by and encourages the sale, or does not forbid it, and thereby induces another person to purchase the estate, his silence may, under the circumstances, have the effect of making the sale binding upon him. 1 Story on Equity, § 385. 3 Rob. 332. 5 Rob. 518. This doctrine is not applicable to the situation of the parties to this suit. It would only be applicable if an attempt was made by the representatives of the deceased to dispute the mortgages, when sought to be enforced by the Union Bank; and we are not prepared to say that the silence of the deceased when the mortgages were given, ought to be so construed as to infer from it that it was, on his part, a renunciation of his title, or an acknowledgment of the defendant's right and title to the whole.

With this view of the principal question, we must come to the conclusion that Milligan, on the 16th of March, 1828, became the owner of one undivided third part of the premises; that said third formed and constituted his interest, or share, in the part-

nership stock, then, subsequently, and until his death, under his management and administration for the benefit of the concern; that the price thereof was to be paid, and was *partly paid*, out of the nett proceeds of the crops; that he never ceased to be the owner of his interest, which belonged to him at the time of his death; and that, the same being now a part of the property belonging to his succession and inventoried as such, the plaintiff and the intervenors have a right to demand that a partition of the partnership property, until now in a state of indivision, be made in the manner provided for by law. This was ordered by the court below, and, we think, very correctly.

But the present action goes further, and it now becomes our duty to enquire into the plaintiff's and the intervenors' demand for the settlement and liquidation of the partnership concerns. It is clear that the partnership was dissolved by the death of Milligan, and that, at that time, its assets and general affairs were subject to be divided and settled according to the rights of the parties thereto. The defendant and surviving partner continued, however, to manage the property, to make crops on the plantation, and to receive the proceeds of these crops; he acted as the *negotiorum gestor* of his deceased partner's representatives, and, as such, became bound to account to them for the product of their share in the crops. He has no right to keep these proceeds, but should impute the portion thereof belonging to Milligan's succession to the extinguishment of the balance which may be due on the price of the property; and, for that purpose, we think the court *a qua* has sufficient jurisdiction; and that this case ought to be remanded, to liquidate the amount which the succession may be entitled to, as proceeding from the crop which was inventoried after the death of the deceased, as also from all the subsequent crops made on the plantation until the partition of the property.

With regard to the defendant's claim against the estate of his deceased partner, for the balance which may remain due on the price of his share in the premises in partnership, we cannot agree with his learned counsel, that it should be considered as a partnership debt, to be satisfied out of the partnership property. It is true that article 2794 of our Code says, that *part-*

*nership assets are liable to social debts, in preference to individual creditors*, and that, by *the 2835th article, a partner may be a creditor of the partnership;* but here the defendant *is not a creditor of the partnership;* he is merely the creditor of his deceased partner, entitled to exercise the rights which he may have against his property, contradictorily with all the other creditors of the insolvent estate. It is true, also, that the share of the deceased in the partnership property was purchased from the defendant's vendors, with the view of its forming a part of the partnership stock; but such undivided portion was Milligan's separate property, with regard to his co-partner, though held in partnership with him, and could only be liable by preference to the payment of the debts due to the *creditors of the firm,* who, under art. 2794 above quoted, have a right to be paid out of the partnership assets, in preference to the creditors of the individual partner. This is the purport of the case relied on, in 5 Mart. N. S. 630, where the question was presented in support of a claim set up by intervention by one partner against the other, in a suit instituted by attachment against the latter, and which claim was based upon the fact of the intervenor's having advanced the funds with which the adventure had been undertaken; and it was decided, that said intervenor was the creditor of the firm for whose benefit the funds had been advanced, and that he was entitled to his right of preference. The distinction is a very obvious one. Here, again, the property was not purchased for the benefit of the partnership, but only for the individual benefit of Milligan; and it seems to us clear, that his vendor, as such, cannot pretend to set up his claim as being *a debt of the firm to be paid out of the partnership assets.* In the case of *Nathan* v. *Gardere,* 11 La. 265, a similar question was presented, and it was held, that *notes given by one of the partners for his share of the price of slaves purchased by the partnership, was not a partnership, but a private debt.* So, it was decided in the case of *Bernard* v. *Dufour,* 17 La. 596, where the question was fully investigated; and in the case of *Millaudon* v. *Silvestre,* so much relied on, 8 La. 262, the plaintiff was allowed to recover after payment of the partnership debts, and after having set aside a fraudulent

sale and mortgage of a portion of the partnership property. See, also, the case of *Morgan* v. *His Creditors*, 8 Mart. N. S., 609.

It results, therefore, that the defendant, as an individual creditor of the deceased, is entitled to oppose his claim as a *reconventional one*, against the plaintiff's demand for the proportion of the crops due to the succession; that, as we said in the case of *Bayne* v. *Fox*, 5 Rob. 2, the jurisdiction of the District Court may extend to the liquidation of claims against successions set up by reconvention or compensation, so far as the two claims set up against each other may be extinguished; but that, after having ascertained and liquidated the balance, if any, that may be due to the defendant, his said balance ought to be referred to the Court of Probates of the parish of Plaquemines for classification according to his rights, and there to be ranked on the tableau of distribution of the insolvent estate, contradictorily with all the other creditors. The court *a qua* was without jurisdiction in such matters, and properly refused to pronounce judgment thereon.

We shall, therefore, abstain from expressing any opinion upon the question, whether the balance that may be due to the defendant is, or is not, secured by mortgage and privilege on the property sold to the deceased, and whether his said mortgage and privilege have been duly preserved, as this question must first be brought to its solution before the Probate Court, contradictorily with the creditors of the deceased, on the filing of the tableau of distribution by the testamentary executor.

It is, therefore, ordered and decreed, that the judgment of the District Court, so far as it goes, be affirmed; but it is further ordered and decreed that this case be remanded to the court below, for further proceedings in the partition of the partnership property, and in the settlement and liquidation of the partnership concerns, and of the crops which the defendant is bound to account for as *negotiorum gestor*, for the purpose of liquidating the balance, if any, that may be due to the defendant, according to the legal principles recognised in this opinion; reserving to said defendant his right to prosecute his claim for such balance before the Probate Court, in due course of law;

the costs of this appeal to be borne by the appellant, and those in the court below to be paid by the parties interested in the partition, in proportion to their respective interests.*

---

* *Briggs* and *Grymes*, for a rehearing. The intervenors have contended that the agreement referred to was in effect a sale, absolute in all its attributes; that, on Milligan's death, the property formed a part of his succession, was correctly inventoried as such, and that the vendor or his representatives must go to the Probate Court, and claim against a succession confessedly insolvent, and co-ordinately with its general creditors, any amount of the purchase money yet unpaid; and that the vendor, in whose possession it has since remained, is bound to account for the crops made up to date ; one-third of these also belonging to the succession of the purchaser.

What was the action of the parties to the agreement subsequent to its execution ? Milligan, who, as is shown by his letter, was then *a manager of the estate*, continued to reside there, and the plantation was worked, as it had been before, under his superintendence. Nothing can be gathered from any acts of the parties calculated to elucidate the matter, till Milligan (with the view to relieve his property from the general mortgage affecting it in favor of his minor child,) settled the succession of his deceased wife, and substituted a *special mortgage* on property held, we believe, in common with his deceased father-in-law, for the one which by law affected all he possessed. In the inventory then taken, he ranks, as his separate property, one-third part of the plantation in question—*but he does not offer it as security*. The articles of agreement were recorded by Milligan in the parish of Plaquemines, on the 4th June, 1830. On the 24th May, 1836, Mylne and Thomson, the resident commercial partners of Alexr. Dennistoun, (who had, under a judgment of the District Court, become the sole proprietor of the plantation,) deposited with A. Mazureau, notary, a power authorising them jointly or severally to sell to themselves, or either of them, or any other person, all real estate belonging to Alexr. Dennistoun. On the 30th August of the same year, Mylne, the defendant, under this power, became the purchaser of the land and slaves, the property in question, by an act *which recites the judgment by virtue of which Alexr. Dennistoun became sole proprietor*, and which act was passed before the same notary, and was, as well as all the others, introduced as evidence *by the counsel of the intervenors*. Mylne, owner of the plantation under this act, so far as the legal effect of language could make him, applied, on the 19th of July, 1836, to the Union Bank, *of which Milligan was then a director*, and who, as it is admitted by the adverse party, *was present at the board*, and proffered, as security for 1200 shares of its stock, the whole plantation under the title just recited.

On the 13th February of the same year, Mylne mortgages (still as proprietor of the whole) the plantation to the same bank, to secure more stock; and on the 4th of January, 1839, he grants a third, still on the whole plantation and slaves, reciting the two preceding mortgages; *and the mortgage is accepted on*

*behalf of the bank, and signed by Milligan himself, as president of the institution.* Milligan died on the 16th of March, 1841. This is all which can be evoked from the conduct of the parties towards elucidating the difficulties in the interpretation of the articles of agreement.

The question, therefore, resolves itself into this: Was the agreement a sale, or was it an agreement to give to Milligan, as he more than once expresses it, *an interest on certain terms and conditions on his part, to be complied with* before that interest could be converted into ownership. We contend that it amounted only to the latter. The counsel for the intervenors contends that it is a promise to sell, clothed with all the formalities of a sale, and good as such under the article which declares that *la promesse de vente vaut vente.*

Article 2431 of the Civil Code, identical with article 1583 of the Code Napoléon, declares that the sale is considered perfect between the parties, and the property of right acquired to the purchaser, with regard to the seller, as soon as there exists an agreement for the object, and for the price thereof, although the object has not yet been delivered, nor payment made; and article 2437 (1589 Code Napoléon) that a promise to sell amounts to a sale, when there exists a reciprocal consent of parties as to the thing and the price thereof: but that, to have its effect either between the contracting parties, or with regard to other persons, the promise to sell must be vested with the same formalities as are prescribed in articles 2414 and 2415, concerning sales, in cases where the law directs that the contract be committed to writing.

Toullier, vol. 9, *Preuve Testimoniale,* c. 6, sec. 2, No. 91, in commenting on the 1589th article of the Code Napoléon, the 2437th of our Code, declares that an act, whether under private signature or not, containing a mere promise to sell, is not proof of a sale, but is a contract requiring another to perfect it; but that this supplementary act may be presumed, where *subsequent* possession is given or obtained. But this possession is evidently of necessity a *subsequent* one, or it is clear the presumption will not arise; in other words, it must amount to an act posterior to an agreement to do another act, by which it would naturally seem to follow that the condition upon which the promise had been made had been fulfilled, and that which had been executory only, became a contract executed; a presumption, as Toullier says, so strong that the Code has made it legal. "La promesse de vente vaut vente, dit l'article 1589, lorsqu'il y a consentement réciproque des deux parties sur la chose et sur le prix." To which, however, he says must be added, " si la promesse de vente est suivie de tradition ou de possession, sans quoi il est certain que la promesse de vente ne peut avoir les mêmes effèts que la vente." He then asks, No. 92: "Why, then, has the 1589th article of the Code Napoléon enounced that a promise to sell is equivalent to sale," and answers that, anterior to the Code, jurists were divided in their opinions as to the nature of the right acquired under a promise to sell, some holding that it gave the right to claim specific performance, and some that the remedy was in damages only; that the commission charged with the formation of the Code adopted the former opinion, without perceiving that the

doctrine was inexact under the modern principles which govern the transfers of property, and which provide *that property is acquired and transferred by the effect of convention, especially sale, although the subject of the contract may not have been delivered.* " Ainsi la première vente, quoique non suivie de tradition, prévaut toujours sur la seconde, même suivie de tradition, parce que le vendeur, n'a pu transférer un droit qu'il n'avait plus." Whilst, on the contrary, he says that a posterior sale is valid against an *agreement to sell, even evidenced by authentic act,* because the property remaining in the vendor, he could transfer it to a purchaser in good faith, leaving the original vendee under promise to his remedy in damages, unless his acceptance was accompanied by subsequent possession, which, as has been stated before, would raise a presumption that the contract *in fieri* had been by subsequent proceedings converted into one *in esse;* and he adds, that if, prior to a sale to a third party, any opposition to my taking possession should be made by my vendor, it could not be maintained on my proving that *I had paid* the price, or offered on the spot to pay it—" puisqu'en vertu de sa promesse je suis autorisé à le contraindre de me passer contrat, et de me livrer l'héritage." What says Troplong? (*Vente,* No. 130.)

" Mais l'article 1589 a-t-il voulu que la simple promesse de vendre valût vente, en ce sens que, comme la vente, elle mit la chose aux risques de l'acheteur et l'en rendit de plein droit propriétaire?

" A cette question je répondrai par une distinction. Ou la promesse de vendre est une promesse de passer un contrat ajoutée *à une vente verbale, ou sous seing privé déjà faite,* et alors le risque pèse sur l'acquéreur des avant la rédaction de l'acte authentique, car, comme le dit Cochin, il y a là contrat *parfait, absolu, sans retour;* ou bien la promesse de vendre ne vient *s'ajouter à aucune convention présente,* et alors, elle ne peut pas plus transférer de plein droit la propriété qu'elle ne faisait dans l'ancienne jurisprudence; car le Code n'a attribué à la promesse de vente que le caractère qu'elle avait dans l'ancien droit. Le nom de Cochin, invoqué par M. Portalis, en est la preuve évidente. M. Grenier, orateur du tribunat, vient la confirmer, lorsqu'il dit : ' L'usage de la promesse de vendre est ausi ancien que la vente. Il n'y avait aucun inconvénient *à le conserver.'*

" Ce sentiment est aussi celui de M. Toullier. ' Il est bien évident, dit-il, que la simple promesse de vendre n'a pas l'effet de transférer la propriété, puisque celui qui promet seulement de vendre n'a pas la volonté de s'en dépouiller actuellement. Il ne s'oblige qu'à la transférer par un nouveau contrat nécessaire pour cette translation. La commission chargée de la rédaction du projet de Code embrassa l'opinion des auteurs qui (dans l'ancienne jurisprudence) pensaient que les promesses de vente obligeaient précisément à passer contrat et à livrer la chose. Elle s'exprime dans les mêmes termes que les auteurs: *la promesse de vente vaut vente,* sans s'apercevoir que cette maxime manquait absolument d'exactitude, sous l'empire des nouveaux principes, qui veulent que la propriété s'acquière et se transfère par l'effet des conventions, notamment par la vente, encore que la chose n'ait pas été livrée. Ainsi, la première vente, quoique non suivie de tradition, prévaut toujours sur la seconde, même suivie de tradition'

parce que le vendeur n'a pu transférer un droit qu'il n'avait plus. Au contraire, la vente postérieure à la promesse de vendre, même authentique, est valide parce que la propriété ayant, nonobstant cette promesse, continué de résider sur la tête du vendeur, il continuait aussi d'avoir le pouvoir de la transférer à un acquéreur de bonne foi, sauf à celui en faveur de qui la promesse avait été faite, de former une action en dommages et intérêts contre le vendeur.'

" En conséquence, M. Toullier décide que la maxime *la promesse de vente vaut vente*, n'est absolument vraie que lorsque la promesse est suivie de tradition et de possession ; sans quoi, dit-il, 'il est certain que la promesse de vente ne peut avoir les mêmes effets que la vente.' *En suivant tous les progrès de l'ancienne* jurisprudence, en recherchant l'origine de l'art. 1589, et en descendant dans la pensée de ceux qui l'ont rédigé il me paraît impossible de ne pas adopter l'opinion de M. Toullier. D'ailleurs, si l'on voulait prendre à la lettre les paroles de l'article 1589, si l'on ne les éclairait pas par les précédens qui ont servi à sa rédaction, on se trouverait entraîné dans les conséquences les plus fausses et les plus contradictoires avec la volonté formelle des parties. Il est déraisonnable de soutenir que la propriété est transmise de *plein droit et actuellement* à l'acheteur, lorsque le pacte intervenu entre les deux promettans fait expressément dépendre la translation du domaine *d'un fait futur, d'un fait que les contractans n'ont pas volu actuellement consommer*.

" 131. Mais sous les autres rapports, la promesse de vendre synallagmatique droit être assimilée à la vente.

" Ainsi il a été jugé par la cour de cassation que c'st à partir de l'acte notairé, passé en conséquence de cette promesse, que court le délai de deux ans dans lequel doit être intentée l'action en rescision de cette vente.

" Cet arrêt me parait irréprochable. Il est fondé sur la combinaison exacte des art. 1589 et 1676. En effet, la promesse de vendre et d'acheter produisant une obligation de livrer la chose et de payer le prix, c'est du jour où elle a été passée que s'ouvre l'action pour s'en faire décharger.

" 132. Puisque la promesse de vendre est équipollente à la vente, *il faut dire qu'elle est susceptible des mêmes conditions suspensives et résolutoires que la vente. Il est même assez ordinaire quelle soit conditionnelle ; &c.*

" 133. *De même que la promesse de vendre peut être conditionnelle, de même elle peut être à terme ; &c.*

" 134. Si les parties veulent se désister d'une promesse réciproque de vente, elles en sont maîtresses, et l'on ne saurait considérer ce désistement *comme une rétrocession de la propriété* ; les tiers, qui auraient hypothèque générale sur tous les biens de celui à qui la promesse aurait été faite, ne pourraient s'en plaindre ; s'ils prétendaient que leur hytothèque soit légale, soit judiciare, suit l'immeuble dans les mains du promettant *désormais affranchi de son obligation*, ils seraient infailliblement repoussés ; car l'immeuble *n'a jamais été la propriété de leur débiteur*. M. Duranton n'a soutenu le contraire, que parce qu'il est imbu de la fausse idée que la promesse de vente *transfère toujours la propriété, comme la vente même*."

The first decision in this State upon these articles, which are identical with 4 and 9 of the old Civil Code, p. 346, is in 3 Mart. N. S., *Crosbee* v. *Neely and others*, p. 583, based on a memorandum which the vendor calls " Memorandum of things *I do sell;*" after enumerating which he says, " of all which I shall authorise a formal sale for the above-mentioned sum of seven hundred and seventy-three dollars fifty cents and a half, half of which shall be paid in December, 1811, and the other half in December, 1812, he, the purchaser, mortgaging the two lots until final payment." The vendor had not signed, but proof *aliunde* was admitted to prove acceptance ; he had it recorded, *paid the price,* and the heirs entered into possession. The defence was, payment to a party not authorised to receive it. The court decided that, admitting this fact, it was proof of assent, and the memorandum was a sale *sous seing-privé.*

In the case of *Josephs* v. *Moreno*, 2 La. 460, the decision is to the same effect. The claim was for specific performance of a promise to sell one-half of a tract of land, on payment of one-half of the purchase money. Assent was proven, as in the case last cited, and the court decreed a conveyance within ten days' notice of the decree, *on payment or deposit of the price stipulated.*

The last case is *Long* v. *French*, 13 La. 258. The memorandum was as follows : " B. F. French *sold* to Wm. Long one lot, &c.; terms, $200 cash, and assumption of mortgages ;" signed by both. The refusal to comply appears to have been grounded upon the refusal of the vendor to warrant the property sold. It was in evidence that the $200 *had been paid*, and assumption of the mortgages *offered ;* in other words, the terms of the contract were completed, and the court decreed specific performance.

Granting that the articles of agreement amount to a promise to sell, we contend that it is established by the authorities quoted, that the expression *promesse de vente vaut vente*, means no more than that when the agreement is complete by the assent of the purchaser, and has become a synallagmatic contract, it is obligatory upon both parties, and that on the refusal of either to confirm the contract by an actual deed of transfer, or the payment of the stipulated price, the recusant can be coerced by application to a competent tribunal, which, as Troplong observes, is a force which *it possesses in common with an actual sale.*

Were this agreement a mere contract in the shape of a promise or agreement to sell at a fixed price, we admit that, under the authorities cited, Dennistoun would have been obliged to comply with its terms ; that it created a right of which Milligan could have availed himself, *on a compliance with the conditions by him to be performed,* and until then was *inchoate* only ; and that, in all the decided cases quoted, as well as in those contemplated by the commentators, the relief was granted to the promisee, where the promisor refused to complete the sale, *after proof that the price had been paid, or real tender offered.*

What are the facts of this case ? Milligan, in his letter, admits that the original purchase was made under an understanding that he was to have *an interest*, the leading terms of which he there details. After the experience of some time he finds the speculation unpromising, and, upon stating his reasons,

tells Hill that he is inclined to withdraw. What says Hill?—"who was too just not to admit their force."—"He assures him, that he might feel no apprehension with respect to the *interest* he had agreed to take, which was an affair of entire indifference, the *arrangement* having no other object than to secure his personal attention to its management; that if the property were not sold, he should always be at liberty to take the *interest* already offered him." On this assurance then, and as manager of the property, he remained until the death of Hill and the arrival of Dennistoun, who elected to continue working the plantation, and entered into a new agreement, the former one, as Milligan himself declares, never having been executed.

What are the terms of this agreement? Dennistoun agrees to sell to Milligan one-third of the plantation and slaves for fifty-two thousand dollars—payable in one, two, three, four, five, six, and seven years, in equal instalments, without any interest until the end of the contract; and, on whatever sum may be then unpaid, Milligan *is to pay six per cent interest, and to give a special mortgage* on the property until the whole is paid. Against this waiver of interest, Milligan was to give the services of ten slaves, and six negroes *in statu liberi;* we say he was to do so, because it is a reasonable construction of the two clauses, and because the court will find that from the *end of this term interest is charged, and wages allowed Milligan for the negroes.* Milligan is to reside on the plantation and manage it, and for these services is to receive one thousand dollars a year. The contract was to last for seven years, at the end of which period, if agreeable to all parties, it was to be renewed; but if a *dissolution* should take place, the value of the property was to be fixed for settlement by mutual appraisement, or by public sale.

Now, this is all the agreement contains in the nature of a contract translative of property. What is it but an agreement or promise to sell on a suspensive condition, to wit, the will of the parties at the end of seven years, and the giving of a mortgage to secure the purchase money unprovided for at the expiration of that term?

Had the parties intended a present transfer of title to the land, would Dennistoun have stipulated for a mortgage at the end of seven years to secure a balance, when he jeoparded through that period *the safety of the whole?* It is clear that Milligan was not called upon to give security until the end of this period. What would have been the effect of judgments against him through the period which preceded it, or, if he were proprietor, of mortgages or sales?

Admitting this contract to be one to which the article of our Code is applicable, it *was suspensive in its operation.* The interest, like the springing use at common law, came into legal and perfect existence when the condition on which it depended had been complied with, and not before. But we deny that this agreement amounts to such a promise to sell as is contemplated by the Code, or the commentators referred to. We contend that the intention of the parties was to form a co-partnership, the stock in trade of which was the property in question—the business to be carried on, the production of sugar. The language of the agreement can bear no other construction. After reciting

the agreement to sell at terms extending through seven years, and providing, in the fourth article, the means by which Milligan was prospectively to become interested in the capital, to wit, the yearly appropriation of one-third of the profits to which his interest was to be limited, the fifth expressly declares that the *contract* should exist for seven years, *renewable* or *determinable* at the option of either party; and that, in case of *dissolution*, the value of the property should be ascertained by mutual appraisement, or by sale; and in the first article, and *coupled with* the agreement to sell, it is stated that, at the *end of the contract*, on whatever sum may remain unpaid, Milligan was to pay interest at six per cent, and give a special mortgage to secure the balance. Why was the mortgage to be given at the end of the seven years? Because it was not until that period that he could be considered an owner of the soil, and because he had not, until he had performed the acts then stipulated, *the power to give it.* This right was to be acquired by the gradual appropriation of the share given him of the profits.

The features of this case are identical with those of *Millaudon* v. *Silvestre and others*, 8 La. 262, although the garbled manner in which the statement of facts is given by the reporter might well make its identity difficult of apprehension. In that case, as will be seen by referring to the original record, Millaudon, on the 3d January, 1833, filed in the District Court of the First District a petition, alleging that, on the 17th February, 1830, he entered into partnership with L & J. L. Silvestre, for the special purpose of manufacturing rum and carrying on a sugar refinery; that, relying on their care and industry, he confided to *their entire possession and management* a large and valuable property, *composing the capital of said partnership;* that Silvestre *père et fils* have neglected their duties, whereby the property has been greatly deteriorated; that they have refused and neglected to pay the whole, or any part of the sums of money stipulated to be paid by said articles, either for capital or interest, or to purchase the necessary means of working the establishment, and have allowed it to suspend its operations, and by their continued neglect have induced disorder and loss, which must be borne by petitioner; that, under the hope of amendment, petitioner has continued to make advances, so that the concern is indebted to him, *exclusive of the capital*, in the sum of $74,603 33, for one-half of which the defendants are liable, but which they refuse to pay; that the concern might yield profit, but as conducted must result in final ruin. He prays for a decree that the partnership be dissolved; that liquidation be ordered, and that defendants be ordered to produce books, &c. that the lands, slaves, buildings, &c., *be sold to accomplish liquidation*, and *discharge debts of concern;* that he have judgment for half the sum of money so due him for advances; that he have judgment for the *interest due on capital, as stipulated in said articles, and for the amount of said capital*, and for general relief. The act of copartnership, annexed as part of the petition, is as follows:

"Les soussignés, Laurent Millaudon d'une part, et Louis Silvestre et Jean Louis Silvestre, associées en cette paroisse sous la raison de Silvestre père et fils d'autre part, désireux de posséder en commun et continuer l'établissement connu sous le nom de distillerie de Fort & Clement, conviennent de ce qui suit:

" Laurent Millaudon vend a Messieurs Silvestre père et fils, la demie de cette propriété connue sous le nom de distillerie, autrefois à Fort & à Clement, ensuite à Abraham Miller et L. Millaudon, et actuellement à ce dernier en seul. La dite propriété située dans le fauxbourg Lacourse, près de la ville, contenant, 1o. sept terrains ;" &c. &c.

Les batisses établissemens dessus et tous les articles énumérés dans le présent sout estimés à quatre-vingt mille piastres, y compris les esclaves et pris en société pour la dite valeur au comptant, la demie vendue à Messrs. Silvestre père et fils est de quarante mille piastres.

Messrs. Silvestre père et fils vendent la demie des esclaves et objets, ci-dessous énoncés, et qu'ils portent dans la présente société, &c.

Lequel total de six mille piastres, montant des objets à Messieurs Silvestre, père et fils, ils en vendent la moitié à L. Millaudon, soit trois mille piastres, lesquelles deduites des quarante mille piastres ci-dessus, ils restent redevables au dit L. Millaudon de la somme de trente-sept mille piastres, valeur de la moitié de l'établissement, distillerie, édifices, et autres objets, et pour cette balance dûe à L. Millaudon, de trente-sept mille piastres, Messrs. Silvestre père et fils, s'obligent à payer jusqu'au remboursement final, un intérêt de six pour cent. l'an, à dater de 10 Février, 1830, et payable au dit Millaudon à la fin de chaque année. Le dit établissement dans son état actuel, tant pour la portion fournie par L. Millaudon et celle de Silvestre père et fils est estimé à la somme de quatre-vingt-dix mille piastres ; le but des intéressés étant de le faire valoir, tant pour y continuer les spiritueux, que pour y travailler les sucres, ils conviennent de ce qui suit :

Art 1. Silvestre père et fils, s'occuperont exclusivement de l'établissement ci-dessus, ils ne feront d'autres affaires que pour le même, et ils y donneront tous leurs soins et temps, &c.

2.    Silvestre père et fils pour leur travail, peines et soins et attentions, de même que pour leur temps donnés à l'établissement auront droit à une somme de deux mille piastres par an, laquelle leur sera payée par l'établissement et fera partie des dépenses du même, &c.

7.    A chaque balance aux époques mentionnés ci-dessus, les comptes respectifs des intéressés séront débités des pertes et credités des profits ; les pertes où profits étant supportés par portion égale, L. Millaudon la moitié, Silvestre père et fils l'autre moitié.

8.    Sur la moitié des bénéfices résultants à Silvestre père et fils seront d'abord prelevés les intérêts qu'ils doivent sur le prix de leur moitié, et l'excédent, s'il y a un payment de cette même moitié de l'établissement, vente que le dit Millaudon leur passera à l'acquit de cette même moitié.

13.    La présente société est pour le terme de cinq ans, à dater de ce jour dixsept Février, 1830, &c. &c.

Nouvelle Orléans, le dix-sept Février, dix-huit-cente-trente.

(Signé)                                    MILLAUDON,
                                           SILVESTRE, père,
                                           J. Ls. SILVESTRE.

Millaudon then filed a suplemental petition, in which he alleges : That since filing the petition he had discovered that the defendants did, on the 25th August last, clandestinely, collusively, and without the knowledge and consent of your petitioner, and without any right or title thereto, sell and convey, by act before C. Pollock, to John Morris Bach, of the city of New Orleans, half the property, moveable, immovable and slaves, which constituted the capital stock of the partnership set forth in the original petition, which sale was made with the view to defraud the petitioner of his property, and convert the same to his own use. That since said sale defendants had appropriated to themselves all the rents, profits and proceeds of the said property, without any payment or satisfaction to your petitioner. That defendants, Silvestre père et fils, *are in possession of said property ;* that he believes it will be deteriorated and fraudulently disposed of, and the whole put without the reach of process, to his damage and loss. He, therefore, prays for a sequestration ; that the facts set forth be taken into consideration in deciding on the prayer of the original petition ; that Bach and Dufour, the pretended vendees, be made parties ; and that the sale, and mortgage thereon granted to Dufour, be declared void, and his property decreed to be restored to him, or sold for the liquidation of the affairs of the partnership.

Bach and Dufour, pleaded the general issue, &c. Silvestre père et fils, pleaded the general issue, averring that, on the 17th February, 1830, they *entered into a synallagmatic contract, under private signature, with the plaintiff, whereby he sold* to them, for the consideration therein expressed, one undivided moiety of certain real estate and slaves therein described, for the consideration therein expressed. They aver that by this *act of sale*, the full and absolute ownership of one undivided moiety of the whole *vested in them*, and that they were at liberty at any time to dispose of the same, except as to the use of the premises which was reserved for the use of the partnership for the time it was to last. That all obligations imposed on them had been complied with, thus denying that the concern was losing. They aver that from the commencement, plaintiff took the entire management of the concern into his hands, without consulting them, and that if it be unprofitable it results from his fraudulent practices ; that the mode of payment, both of interest and capital of the balance due to the plaintiff, is provided for by the contract itself; and they aver that plaintiff's own acts have stopped them from finally discharging the same. They deny that any sum was due to him, or, if so, aver that it was covered by the proceeds of sales, and shipments made by plaintiff unaccounted for ; *and as for the balance due on the price of the sale, contend that plaintiff has no right of action in the form in which the suit is brought*, because owing to his own wrong the condition stipulated was not complied with and the payment fulfilled. They aver that the sale was *bona fide*, openly and publicly made ; that they had a right to make the same, having reserved the use for the period of the partnership. They pray for a dissolution of the sequestration, as the profits of the term would have equalled the purchase money unpaid, and for general relief, &c.

The settlement of accounts was referred by the court to auditors, who reported a balance due to the plaintiff of $39,490 76 and $37,760 84, making together

the sum of seventy-seven thousand two hundred and fifty-one dollars and sixty cents; the distillery and utensils, buildings and slaves belonging one half to each of the parties. This report was afterwards corrected by the court, and reduced to $68,067 77.

The court rendered judgment, that the partnership be dissolved, that Millaudon recover from Silvestre père et fils, $68,067 77, with costs. That the property described in the articles of partnership, and sequestered, *be sold to satisfy the debt*, and *in block as incapable of division*. That the act of sale to Bach be made null and void, and the mortgage therein stipulated cancelled and annulled. In giving his reasons for the judgment, the district judge, says : " This act contains : 1. A preamble of their general agreement and intentions. 2. Special articles of agreement. The preamble recites that Millaudon and Silvestre père et fils, being desirous to possess in common and to continue the establishment known by the name of the distillery of Fort & Clement, agree as follows : *Millaudon sells to Silvestre half of the distillery, describing the lots and property minutely, also the slaves and distillery utensils*, the whole estimated at $80,000, and put into the partnership at that price cash. The half sold to Silvestre is $40,000. *Silvestre sells to Millaudon certain slaves and utensils valued at* $6,000 ; and deducting $3,000 there remained due to Millaudon $37,000, the value of half the distillery, edifices, and other objects, on which sum Silvestre binds himself to pay Millaudon an interest at the rate of six per cent until its final reimbursement. The whole establishment is estimated at $86,000. The 8th special article provides that, from half of the profits coming to Silvestre, there shall be taken annually the interest they will owe on the price of the half; and the excess, if there be any, is to go towards the payment of that half of the establishment, a sale of which Millaudon will pass to them on payment of that half. The other articles are irrelevant.

" I am fully aware of the article of the Code and the decisions of the courts, *that an agreement to sell, is a sale;* but *that does not prevent making of conditions, upon the fulfilment only of which it is to take effect.* If a party make a sale, upon condition that the buyer pay down the price, it can have no effect till the price is paid down. If half only is paid, the buyer has a certain interest in the property, but cannot be said to be owner till the whole price is paid. *This whole contract must be taken together*, and when Millaudon says *he sells*, the paragraph of the 8th article must be added—that when full payment is made he will pass title. If we look to his intention, as clearly gathered from the act, it cannot be said that he intended to pass a title at that moment. *It is an agreement in relation to the sale of lands, and which has certain effects, but it is not a sale.* His contract is especially open to interpretation by intention ; it is a complex contract, with many special clauses ; it is a contract of partnership, in which if there be any obscurity, intention is to be looked for. *The words of the 8th article being a special stipulation, are to control the more general terms* of the preamble; and, it is clear, from the 8th article, that there was no intention to vest present title. The words of the preamble are in the present tense, but it is well known that this form of expression is frequently used with a future sense. The speaker or writer regards more the in

tentions which are at the moment operating on his mind, than the future acts which are the result of those intentions. I repeat, if the whole act be taken together, viz: all those parts which relate to title and ownership of the property, it clearly was not the intention of Millaudon to convey any title till the property was paid for, and this intention is clearly to be gathered by any man who reads the instrument with a wish fully to be informed of its meaning. But another view of the subject is to be taken.

"I am aware of article 2796 of the Civil Code, and of the case in 3 La. 494; but I do not consider that that article prevents the parties from converting real estate, and slaves even, into commercial partnership property, if they see fit. There is nothing prohibitory, and no policy of law, against it. I consider the article as a mere general definition and description of a commercial partnership, as ordinarily entered into; not as containing any restriction on the right of parties to contract as they see fit, &c."

It will be seen that here, as in the case under consideration, Millaudon was sole proprietor; that he sells a moiety of the premises, and that the vendee, as is the case with Milligan, is in what is termed *possession of the premises*. It is true that the object of the parties in making the sale is here expressly declared to be a partnership, whilst in our case the intention is inferred from language which, to our apprehension, is unequivocal. The lower court held the instrument one to be construed by intention, and that the words of conveyance were to be controlled by the context, and that *title did not pass*, but that the property remained in Millaudon until fulfilment of the conditions on which the sale was predicated, it being a partnership capital for which Silvestre was still indebted to the firm, or if the court please, to the plaintiff. Had the words, *Millaudon sells to Silvestre*, conveyed a right of property, the court could only have given judgment for the debt; and, however it might have dealt with the personalty, it is clear the realty could have been got at only by an hypothecary action, or by an ordinary sale under execution.

It is clear then that the lower court did not consider that the property had changed hands.

What was the decision of this court on appeal? "That all the property mentioned and described in the articles of partnership, and which has been sequestered in this suit, be sold to satisfy this debt and judgment, and that it be sold in block as incapable of division, viz: the land, buildings, dwelling, refinery and distillery utensils by themselves, and the slaves by head." A decree which, for the reasons already urged, involves a necessary adherence to the views entertained by the lower court, as it would otherwise be in violation of all law.

In the opinion of the court in the present case, they say: "Let us inquire a little further into the subsequent acts of the parties; and what do we find? From 1828 the partnership premises were placed under the control and administration of the deceased," &c. This is not the fact; they had been so placed from the date of the original purchase, and so continued throughout the whole interval between that time and the signing of the articles of agreement, and so continued till Milligan's death; no change was effected, no possession given; he was, prior to the agreement resident on the land as manager—he was so afterwards; and

paid as such, though, through the generosity of his partner, clothed with prospective rights of ownership. The court asks why, if the sale were not complete, was he charged with one third of the disbursements for improvements, and credited with one third of the proceeds? The answer appears to us plain. We admit that he had the right to claim a third, on the fulfilment of certain conditions of which these formed a part, and because he was entitled under the agreement to these credits, and was obliged to contribute to the augmented value.

The court say "that, with regard to the defendant's claim against the estate of the deceased partner, for the balance which may remain due on the price of his share in the premises in partnership, we cannot agree with his learned counsel, that it should be considered as a partnership debt, to be satisfied out of the partnership property."

The 2794th article of the Civil Code declares, that partnership property is liable to the creditors of the partnership in preference to those of the individual partner; but the share of any partner may, in due course of law, be seized and sold to satisfy his individual creditors, *subject to the partnership debts ;* but such seizure, if legal, operates as a dissolution of the partnership." The 2835th article: That " a partner may be a creditor of the partnership, *not only for the sums which he has disbursed, but likewise for the obligations which he has entered into, bona fide, for the partnership,* and for the losses reasonably incurred in his administration." The latter article is, in effect, and nearly in words, identical with art. 1852 of the Code Napoléon, which declares that, " Un associé à action contre le société, non-seulement à raison des sommes qu'il a déboursées pour elle, mais encore à raison des obligations qu'il a contractées de bonne foi pour les affaires de la société, et des risques inséparables de sa gestion."

Pothier, Société, in chapter 7, which treats " Des choses dont un associé peut être créancier de la société, et dont les autres associés sont obligés de lui faire raison, chacun pour la part qu'il a dans la société," says, no. 126 : "Lorsqu'un associé a mis dans la société des choses dont il ne devait que la jouissance par le contrat de société, il est créancier de la société pour lesdites choses, qui doivent lui être restituées lors de la dissolution de la société." He adds, that if the objects were not of a nature to sell, and which he was to take back in specie, they remain at his risk; if, on the contrary, they were saleable, or subject to deterioration, and had been contributed under valuation, he is a creditor, not for the things, but for the value. The source from whence was derived the 2835th article of our Code, is no. 128, where Pothier says : " Un associé doit être indemnisé par la société non-seulement des déboursés qu'il a faits et des obligations qu'il a contractées directement et principalement pour les affaires de la société ; il doit parreillement l'être des risques et des hasards qu'il a courus, lorsqu'ils etaient inséparables de la gestion qu'il a eûe des affaires de la société, et qu'il ne les a courus que pour les-dites affaires :" and here we would specially call the attention of the court to the reasons given, which furnish a clue to a doctrine universally acknowledged in the courts of England : " Car la société devant avoir tout le *profit* qui résulte de cette gestion, il est équitable qu'elle supporte tous les risques. *Ubi lucrum, ibi et periculum esse debet.*

Favard, verb. Société, chap. 2, sec. 5, § 2, holds the same doctrine: "La société devant profiter de tous les gains et bénéfices qui peuvent résulter de la gestion de ses affaires, elle doit supporter toutes les dépenses que cette gestion peut occasioner, et, par suite, elle doit indemniser l'associé qui en est chargé de toutes les pertes qu'il a éprouvées, et de toutes les dépenses qu'il a été obligé de faire, par suite des risques inséparables de sa gestion."

Delvincourt is to the same effect. Vol. 3, page 122, § 11, 12, 13.

At common law this principle is universally acted on, not only as a legal but as an equitable principle. Gow, page 235, in speaking of the consequences of a dissolution says: "The joint property being disposed of, the joint creditors have primary claim in the fund constituted by its produce. This is consonant with the principle, *qui sentit commodum sentire debet et onus;* as partnership property has been acquired by the means of partnership debts, it ought to be first applied in discharge of them."

Story, in his treatise on Partnership, p. 135, says: "Besides this community of interest in the capital stock, funds and effects of the partnership, each partner has certain rights, liens, and privileges thereon. In the first place, no one partner has any right or share in the partnership property, except what remains thereof after the full discharge and payment of all the debts and liabilities of the partnership; and, therefore, each partner has a right to have the same applied to the due discharge and payment of all such debts and liabilities, before any one of the partners or his personal representatives, or his individual creditors, can claim any right or title thereto." "Each partner has also a specific lien on the present and future property of the partnership, not only for the debts and liabilities due to third persons, but also for his own amount or share of the capital, stock and funds, and for all moneys advanced by him for the use of the firm, and also for all debts due to the firm for moneys abstracted by any other partner from such stock and funds beyond his share." "Hence it may be stated, as a general corollary from the foregoing considerations, that no separate creditor of any partner can acquire any right, title, or interest in the partnership stock, funds or effects, by process or otherwise, merely in his character as such creditor, except for so much as belongs to that partner, *as his share or balance, after all prior claims thereon are deducted and satisfied.*"

Suppose the case of a partnership for a term of years, in which the capital is wholly furnished by the one, an interest immediate in the profits, and contingent in the capital, given to the other, to wit, on his contributing certain sums at stated periods. So long as the concern goes on well, the working partner, as he is called, receives the benefits arising from the employment of his partner's capital, and, at length, by contributions on his part, becomes an owner of the stock to the extent of his share. Now reverse the case, and suppose the concern results in loss, according to the doctrine established by the court, the capitalist, as we admit, is first bound to pay all social debts. to the amount, not of the share he has in the profits, but as though he had been alone liable. The articles of copartnership bind him to this extent; but when the converse of the rule is sought to be enforced, we are told that, for this payment, on behalf of the firm, of

debts which his copartner was bound to liquidate, he is not a creditor of the firm, but of the individual partner, to whose estate, in common with a mass of individual creditors, he is to look for payment, and of which his share in the residue of partnership assets, if such there be, will form an item.

We can establish no distinction between the advance, on the creation of the partnership, of the whole stock in trade by one partner, and subsequent advances or sales he may make to it during its continuance, and we confess our inability to seize the distinction as laid down by the court. Much difficulty is created by the imperfect state in which our law is left by the Civil Code. We are referred to laws which have never been enacted, and, in the absence of enactment, are sent to seek such law as we may find. We have shown that, under the French law prior to the Code, partners of the firm were its creditors for advances made, or risks or obligations entered into for its benefit, upon the principle that *ubi lucrum ibi et periculum esse debet*, and that writers since that period have laid down as law the same doctrine; that both at law and in equity, in a country in which this subject is perhaps as fully understood, and the interests of parties as carefully guarded as in any upon earth, the principle is recognised; and that th e same has been sanctioned by the writers and decisions in this country.

What are the decisions in this State upon the subject? The case of *Purdy et al.* v. *Hood et al.*, 5 Mart. N. S. 630, expressly recognises the doctrine. We do not comprehend the distinction drawn by the court, between this case and the one at issue. The court says, "the distinction is a very obvious one; here, again, the property was not purchased for the benefit of the partnership, but only for the individual benefit of Milligan; and it seems clear that his vendor, as such, cannot pretend to set up his claim as being a debt of the firm, to be paid out of the partnership assets." In the case quoted, the attaching creditors recovered, because they proved that they alone had furnished the means of payment for the property attached, and they were held to be creditors of the partnership, and their right to claim against an individual creditor of their partner established.

Where does the court find authority to say, that the property was not purchased for the partnership, but for the separate benefit of Milligan? It was originally bought, it is true, with reference to his interest, *which he rejected;* after a lapse of about eight years, *he changed his mind*, and was, when the property had become wholly that of his partner, admitted into the concern. But the putting in of the capital was an act of Dennistoun alone, and for it he surely had the rights and remedies accorded, under the principles we have expounded, to partners who thus become creditors of the firm for advances they have made on its behalf. *Without this contribution could the partnership have existed, or the profits have been realized? Unless the partnership had been the inducement, would the sale have been made?*

In *Nathan* v. *Gardère*, we confess that the court seem to have entertained an opinion adverse to our views, but we are obliged to say, with all respect to its opinion, that it is one which cannot be reconciled with what we conceive to be sound law, and at any rate it can rank but as a dictum, the case having been decided upon the ground that the property, for the purchase of which the advance was

claimed to have been made, was separated from the stock in trade by the act of the claimant, and had ceased to be partnership property.

In the case of *Bernard, Syndic,* v. *Dufour,* 17 La. 598, the parties were partners in a commercial firm, and purchased, as a matter of speculation, real estate, it is alleged, with means furnished by the firm; but the property was not purchased as essential to the carrying on of the copartnership; it was bought by what, had the concern gone on well, would have been the profits, which they had a right to use as they thought fit; and in this view of the case, certainly, would have been individual property. Did the failure of Paloc change its nature? The court decided it did not, and we conceive correctly; because this was not an advance on account of the firm, *by which its creditors were or might be benefited,* and which claims protection under the maxim we have already more than once cited, but a conversion, by both partners, of means which they might, in the like manner, have spent in wine or horses.

We now come to the case of *Millaudon* v. *Silvestre,* which winds up the authorities referred to in the judgment, and we contend, as we have already contended, that it is conclusive on the subject.

The court, in adverting to this case, has said: " There is a vast distinction to be made between this case and that of Millaudon v. Silvestre, 8 La. 262, relied on by defendant's counsel, and to the record of which we have been referred. There the object of the action was to dissolve the partnership, to liquidate the partnership affairs and to recover whatever sums of money might appear to be due to the plaintiff on such liquidation and settlement. *The sale of one-half of the partnership property from Millaudon to Silvestre was maintained, with the vendor's privilege.* The sale subsequently made to a third person, of the same property, was declared *collusive and fraudulent;* and the plaintiff was allowed to recover the sum due him out of the proceeds of the sale, in block, of the whole of the partnership property, without any regard to the collsuive sale made in consequence of the omission to record the act of partnership under which the property was claimed. Here there is no fraud alleged against any of the parties; the intervenors only seek to maintain the sale for the benefit of the creditors of the deceased. The contract was a *bona fide* one, and must be governed by the ordinary rules."

We are at a loss to conceive whence these inferences can be drawn. That the partnership amounted to, or was in effect a sale, was *expressly denied* by the judgment of the lower court, and the decree was rendered upon the ground *that no title had or could pass by it.* The property was partnership assets, and was to be sold as such; and the auditor's report shows that the capital contributed there, as in our case by the monied partner Millaudon, was a debt which he had a right to claim out of the partnership assets.

The fraudulent sale to Bach and Dufour was a mere accessory to the original question at issue. The suit was commenced in the form in which it terminated, in ignorance of the whole transaction; it was by a supplemental petition that this feature was disclosed, and the court, in avoiding the sale, merely decided that it was a transaction which could not interfere with the right the plaintiff had, to exercise in the matter originally prayed for, his right as a partner.

Thomson, Executor, v. Mylne.

In conclusion, we have to offer a few remarks upon the kind of estate which partners take in real estate, when made the capital of a copartnership. In *Skillman* v. *Parmele and others*, 3 La. 494, the court, quoting the 2796th article of the Code, defining commercial partnerships, and remarking the exclusion of immovables in the subjects enumerated, says : " If the purchase of slaves or real estate were not only convenient, but indispensable to carry on the commercial partnership, there would be great strength in the argument that the law allowed such things to become partnership property, for *where the law gives the end, it grants the means.* But in our view, it is by no means essential that either land or slaves should be acquired by the firm, to enable it to have the enjoyment or use of them. If either or both are required to facilitate their business, they may purchase them, and with any funds they please ; but as the law confines their partnership to personal property, they will be *joint owners, not partners.*

" This view of the subject will become more clear by again referring to the definition in our Code of a commercial partnership. It is stated to be, for the buying and selling of personal property as agents, or carrying personal property for hire. The purchase of slaves or houses, to enable the firm the more conveniently to do these things, comes within no branch of this definition ; and consequently is not an act which can be done by a commercial partnership. If land or slaves could become partnership property, where the firm was mercantile, it would follow that they must be governed by commercial law. The Code of Commerce in France does not, like ours, limit, in express terms, commercial partnerships to personal property ; but notwithstanding the greater latitude of its definition, it is considered there that such an association can only act on things which are moveable. *Code Com. Note by Paillet, Manuel de Droit Français.*"

In *Baca* v. *Ramos and others*, the court says : " The act of sale by which the premises was acquired shows that the purchase was made by the parties to this suit as partners trading under the firm of Joseph Ramos & Co., and a note was given for one-half the price, bearing the signature of the firm. The *partners were joint owners*, and either of them might have sold his undivided share, or interest, in the property (3 La. 496), *but in case of such seizure and sale he must have accounted to his partners for the price*, nor could he have occupied any part of the property for his private use without compensating his copartners. *In fact, the title to one undivided third was in him, but the value thereof belonged to the partnership.* When the plaintiff withdrew from the partnership, and received a given sum, he relinquished his interest in the value of the house and lot in question to his copartners. He has therefore no right to demand a sale for partition, as, immediately after it, the price, being the value of the premises, would instantly become the property of the defendants.

" The distinction which we have taken between the title by which property is held, and the value thereof, is well known in other States of the Union where the common law prevails ; these rights are there distinguished as ' legal title ' and ' equitable title ;' there courts of equity enforce the rights of the equitable owner, by compelling the legal one to make a conveyance, precisely as we did in the case of *Hale* v. *Sprigg*, 7 Martin, 243."

In the case of *Paloc* v. *Dufour*, already cited, the court says: "The documentary evidence in the record shows that H. Paloc and C. Dufour became joint purchasers, each of one undivided parcel of ground situated at the corner of Dumaine and Burgundy streets, on which they caused the said six houses to be built. The Louisiana Code, art. 2777, provides that a community of property does not, of itself, create a partnership, however that property may be acquired, whether by purchase, donation, accession, inheritance, or prescription. If the parties had contemplated making, in relation to this property, an ordinary and particular partnership, they would no doubt have reduced it to writing, and had it recorded."

From the principles established by these decisions, we must conclude—

1st. That immovables may become the subject of particular partnerships.

2d. That although the partners take title as joint owners, when the purchase is by partnership funds they are but trustees for the partnership; or, in other words, are bound to account to the firm for the advance or price, and this where, as in the case last cited, the purchase made was not with a view to the object for which the partnership was formed.

Now the Code, in giving the preference to social creditors on the assets of the partnership, and in declaring that partners may be creditors of the firm for advances made to it, must have contemplated ordinary partnerships, because, by art. 2823, it is declared, that "the particular rules by which *commercial partnerships* are governed will be found in the Commercial Code. All the provisions not repugnant to those contained in that Code, are also applicable to commercial partnerships.

Story says, in his treatise on Partnership, p. 126, § 91, 92: "The true nature, character and extent of the rights and interest of partners in the partnership capital, stock, funds and effects, is therefore to be ascertained by the doctrines of law applicable to that relation, and not by the mere analogies furnished by joint tenancy or by tenancy in common. It may, therefore, be said, that in cases of real partnerships, *unless otherwise provided for by their contract*, partners are joint owners and possessors of all the capital, stock, funds and effects belonging to the partnership, as well those which are acquired during the partnership as those which belong to it at the time of its first formation and establishment. So that whether its stock, funds or effects, be the product of their labors or manufactures, or be received or acquired by sale, barter or otherwise, in the course of their trade or business, there is an entire community of right and interest therein between them; each has a concurrent title in the whole, or, as Bracton says, *tenet totum in communi, et nihil separatim per se*.

"Nor is there in reality, as between the partners themselves, any difference, whether the partnership property, held for the purposes of the trade or business, consist of personal or moveable property, or of real or immovable property, or of both, so far as their ultimate rights and interests therein are concerned. It is true, that at law, real or immovable property is deemed to belong to the persons in whose name the title by conveyance stands. If it is in the name of a stranger, or of

one partner only, he is deemed the sole owner at law : if it is in the names of all the partners, or of several strangers, they are deemed joint tenants or tenants in common, according to the true interpretation of the terms of the conveyance. But, however, the title may stand at law, or in whosesoever name or names it may be, the real estate belonging to the partnership, will in equity be treated as belonging to the partnership like its personal funds, and disposable and distributable accordingly ; and the parties in whose name it stands as owners of the legal title will be held to be trustees of their partnership, and accountable accordingly to the partners, according to their several shares, rights and interests, in the partnership, as *cestuis que trust*, or beneficiaries of the same. Hence, in equity, in case of the death of one partner, there is no survivorship in the real estate of the partnership, but his share will go to his proper representatives."

In *Millaudon* v. *Silvestre*, the court decided strictly on these principles ; the real estate and slaves were considered, alike with the moveables, partnership assets ; the title of joint ownership or joint tenancy did not vest in the Silvestres, because it was, in Judge Story's language, " *otherwise stipulated in the contract ;*" but the interest was joint, and properly so treated.

In *Baca* v. *Ramos*, 10 La. 417, these doctrines were to a certain extent admitted. In the other cases cited, the adverse seems to have been the opinion of the court ; the difficulty of *stare decisis* exists in the way of either position, for they are hardly reconcilable with each other ; but the case of Silvestre was more elaborately argued, and involved interests of very much larger extent, and we confess our conviction that it is more correct in principle, and as such should rank as the ruling case.

At all events, whether treated according to the doctrines of the commercial law of England, the Lex Mercatoria of the United States, or by the more limitted and technical views taken by the Civil Code, we are entitled to rank as creditors of the firm ; and as such to be paid by preference out of the assets. Or, if the court should still be of opinion that the articles operated as a sale translative of title, we think we have shown that it was conditional only, and was inchoate or rested in right, until the conditions upon which it was stipulated were performed, these conditions being of the essence of the contract, which was in itself complex, indivisible, and incapable of partial execution. Civil Code, arts. 1950, 1945, 1940 § 5.